Kathleen D. HALL, now Kathleen D. Rogers, Appellant (Plaintiff),

v.

David C. HALL, Appellee (Defendant).

No. 85–38.

Supreme Court of Wyoming.

Oct. 18, 1985.

Rodger McDaniel, Southeast Wyoming Law Offices of Rodger McDaniel, Cheyenne, for appellant.

Murlie C. Hanson, Cheyenne, for appellee.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

CARDINE, Justice.

This is an appeal from an order modifying the custody provisions of a divorce decree. Appellant argues that the district court erred in cutting short the trial on the merits and in limiting her opportunity to present rebuttal evidence and argument.

We agree that error occurred but can find no prejudice and thus affirm.

On June 25, 1977, appellant and appellee were married in Cheyenne, Wyoming. On April 1, 1981, appellant gave birth to a daughter, Heather, and on January 12, 1983, she gave birth to a son, Christopher.

Appellant filed for divorce on March 30, 1984, and appellee counterclaimed on April 17. Both parties sought custody of their two children. A hearing on the custody question was set for June 19, 1984. Just prior to the scheduled hearing, the parties entered into a Property Settlement Agreement which also covered custody of the children. Under the agreement the parties were to have joint custody on the following terms:

"a. From the period of the date of this Agreement through July 15, 1984, the husband shall have physical custody.

"b. From the period of July 15th, through August 15th the wife shall have physical custody.

"c. Beginning August 15, 1984, and continuing for a period of six (6) months the husband shall have physical and primary custody of the minor children.

"d. Beginning February 15, 1985, and extending through August 15, 1985, for a period of six (6) months, the husband shall have physical and primary custody.

"e. Such six (6) month alteration in physical and primary custody of the children shall continue on an alternating basis until August 15, 1986. At such time, such alternating primary and physical custody shall change to a school year of nine (9) months and summer month schedule so that parents alternate school years and divide equally the summer months, so that the parent who *has not* just ended school year custody will have the first ½ of the summer and the parent who *has* just ended school year custody shall have the last ½ of summer and then the beginning of the next school year shall be the other parent on an alternating basis.

"f. During such periods of time set forth above, the non-primary custodial parent shall have visitation with the children two (2) days per week with a split of each weekend with the other parent, or, if the parties mutually agree, an alteration of weekends with each parent having every other weekend. In addition, the parties will alternate holidays and birthdays of the children and the father shall have visitation with the children on Father's Day and the mother on Mother's Day and additional visitation shall be allowed as can be mutually discussed and agreed upon by the parties.

"4. The above visitation schedule is predicated upon the premise that both parents will continue to reside in Laramie County, Wyoming, and, in the event either party moves from Laramie County visitation shall be renegotiated."

The agreement also imposed upon appellee the obligation to pay $300 a month in child support when appellant had primary custody.

On June 27, 1984, a Divorce Decree was entered by the court. It provided that custody would be in accordance with the Property Settlement Agreement. Shortly thereafter, the parties agreed to alter the custody provisions. The periods of primary custody were switched at appellant's suggestion. Also arrangements were made to switch two one-week periods in August of 1984 in order to accommodate appellant's vacation plans.

On September 18, 1984, while she had custody of the children, appellant called and informed appellee of her decision to marry Lonnie Rogers and move to East Grand Forks, Minnesota. Appellant asked if appellee would permit primary custody to be vested in her. She indicated that she would be willing to transport the children back to Wyoming so that appellee could have them for one month in the winter and two months in the summer. She also stated that, if appellee was agreeable to this arrangement, she would no longer need any child support.

On September 25, 1984, appellee telephoned appellant and announced his deci-

sion. He also mailed to her the following letter:

"Tuesday, September 25, 1984

"Dear Kathy:

"In light of recent conversations with you concerning your decision to move from Wyoming to another state, I have decided, on the advice of my attorneys, to exercise my right of primary custody of Heather and Christopher Hall during this six-month period, effective today. Also, I would like to have an additional month added to my primary custody period, extending it to March 15, 1984.

"According to my attorneys, our property settlement is still in force, and therefore I exercise my right to it at this time. Our original agreement was set up so that Heather Hall would start school during my nine-month custody period, and as you have indicated to me verbally that you do not [intend] to fulfill that agreement—i.e. taking the children to another state—I feel I must exercise my rights according to the agreement we signed.

"You may contact me when you wish about your visitation during this six month period. I am sure we can continue to cooperate fully within the spirit of the agreement and with the best interests of the children in mind.

"Sincerely,

"/s/ Dave Hall"

After notifying appellant of his intention, appellee picked up the children from the day care center and assumed primary custody.

Appellant filed a Petition to Modify Divorce Decree on September 27, 1984. She alleged that her plans to remarry and relocate were a change in circumstances justifying a change in the previously-agreed-to custody provisions.

Appellee filed a response to the modification request on October 12, 1984. Appellee denied that there had been "a substantial change in circumstances justifying a modification" of the custody provisions. He also requested that he be awarded primary custody if the court determined that a substantial change had occurred.

The matter proceeded to be tried to the court on November 12, 1984. Appellant, bearing the burden of proof that a change in circumstances had occurred, presented her case first. She was the first witness called. She testified about her remarriage and her relocation plans. She also discussed her children and their special needs and was of the opinion that she was better equipped to respond to these needs.

Next appellant's new husband, Lonnie Rogers, testified. He explained from his perspective the circumstances of his marriage to appellant. He outlined his financial resources and his expectations for his and appellant's relocation to Minnesota. He discussed his past, his family, his two previous marriages, and his relationship with his own children, as well as his feelings for the parties' two children.

Appellant then called Dr. Patricia Fleming, a psychologist practicing in Cheyenne. She gave her expert opinion concerning appellant and Mr. Rogers and their relationship with appellant's children. She concluded that despite the nineteen-year-age difference between appellant and Mr. Rogers, the short duration of their courtship, and their prior marriages, they had a good relationship and a good chance of a successful marriage. Dr. Fleming also evaluated appellee's personality. She had available to her another psychologist's findings concerning appellee. Ultimately she recommended that "the children would be better placed with their mother."

Appellant's final witness was Vendal Trefren. She was a friend and neighbor of appellant. She testified that, on the basis of her contact with appellant, she believed that appellant was a good mother.

Appellee commenced his case in chief by calling Dr. Gale Giebler, a psychologist practicing in Greeley, Colorado. Dr. Giebler testified that he had evaluated appellant and appellee in June of 1984 and at that time had recommended to the court that joint custody be awarded to the parents. Since that time he indicated his only contact with the parties had been with ap-

pellee. That occurred on October 25 when appellee brought both children to Dr. Giebler's office for a two-hour period. Dr. Giebler had no new contact with appellant and had no contact at all with Mr. Rogers. Dr. Giebler concluded that appellee was a wonderful and remarkable father. On the basis of what he had been told about appellant and Mr. Rogers, he found "her showing a more selfish interest or more self-centered interest than [he saw] in Mr. Hall" because of her marriage and relocation plans. The suddenness of the marriage also concerned Dr. Giebler because it reflected instability, as did appellant's employment history and recent decision to quit working and stay home with the children. Dr. Giebler found cause for concern over Mr. Roger's finances. He stated, "I don't know if that is secure." He was also worried by the age difference between appellant and Mr. Rogers: "[I]t's uncommon to have that kind of an age span and more difficult for compatibility to be achieved with such an age span."

After Dr. Giebler, appellee testified in his own behalf. Appellee related the difficulties he had with appellant over the custody issue. He accused Mr. Rogers of threatening him by stating that they were going to court and appellee should pull his pocketbook out. Appellee also accused appellant of being neglectful of the children from time to time. He expressed concerns over the religious training the children would receive from appellant and Mr. Rogers, as well as their use of television as a babysitter. Finally, he explained how close he was to the children and what he was doing to meet their special needs.

At the conclusion of appellee's testimony, the following occurred:

"THE COURT: Thank you, sir, you may step down. Anything else you want to put on the record? I'm not going to hear any more testimony except some short rebuttal by the Plaintiff, and we are going to take a short break. We'll be in recess.

\*　　\*　　\*　　\*　　\*　　\*

"THE COURT: Mr. McDaniel, do you have any rebuttal?

"MR. McDANIEL: Your Honor, is it my understanding that you're ruling that rebuttal will be limited to one witness?

"THE COURT: Limited to one witness, right.

"MR. McDANIEL: For the record, I would like to note an objection.

"THE COURT: All right. You may, sir."

Appellant then took the witness stand. She responded to the charges made against her by Dr. Giebler and appellee. When her testimony was concluded, appellee's attorney indicated she had an objection to make for the record.

"MS. HANSON: In lieu of the Court's decision not to allow Mr. Hall to offer any more testimony, Mr. Hall would like to inform the Court he had about one and one-half more hours of case left with six witnesses who had been outside. The names are Sally Baker Wade (phonetic), who would have refuted the intentions of the Plaintiff, Mrs. Rogers, who stated here regarding her plans to go to work and go back to school, statements which would have made sense, at the time of the divorce on or about September 21st, 1984. A Mary McHombry (phonetic) who would have testified to his devotion to the children in placing their interests prior to his own. A Nick Montpliss (phonetic) who would have testified concerning Mr. Hall actually refusing to take part in a play because of the time needed for the children. Jean Sykes (phonetic) would have testified regarding Mr. Sykes' allowing Mr. Hall to babysit for his children. A Mr. Hal Davis as to the children. A Mr. Mack Hall would have testified to Mr. Hall's ability regarding Mr. Hall's obligation and child rearing practices, and Christa Rader (phonetic) would have told the Court of the recommended treatment for Christopher regarding his speech development and the follow-up recommendations and the success of Mr. Hall and the treatment, and I also want to put in the record a notation the Plaintiff's case has taken longer than the De-

fendant's, and in our estimate of trial or hearing time before, we did not know how long it was going to take, that the Defendant has only had about two and a quarter hours up until this point, and Plaintiff has had about four hours.

"THE COURT: All right. Thank you, counsel.

"MS. HANSON: Thank you.

"THE COURT: Both sides have ten minutes to sum up. Mr. McDaniel, you're first, and do you wish your summations to be taken by the Court Reporter?

"MR. McDANIEL: No, Your Honor, that's not necessary. I would like the record to reflect an objection to your order denying rebuttal.

"THE COURT: All right. Do you have any particular witness you were going to call that you wish to put in the record?

"MR. McDANIEL: Your Honor, I would have called such witnesses as were necessary to rebut the evidence which Ms. Hanson has reflected in her offer of proof. We would have called as well, Lonnie Rogers for rebuttal, so he could testify in rebuttal with respect to some of the issues raised by Mr. Hall in his testimony."

Thereafter, closing arguments were delivered. These arguments were not reported. The court then rendered its decision.

"Now, there have been some changes, there has been a marriage of a short duration. There will be a move and joint custody, I would agree, it's no longer feasible and would be difficult in the best of situations, because you cannot expect these children to go to one school for nine months and next year go to another school. When they reach that age, that's certainly not in their best interest. People get divorced in this country and they remarry and they move. We are a moving nation. That's why joint custody is not a good thing. The Court finds that both mother and father are good people, are good parents that are trying their best in their own fashion to do the best thing for their children. Both think that in adopting a position that they have, that they are doing the best for their children. Now, in the eyes of many, that may—that may not be true, but it's something we can't be objective about when we're so vitally concerned, such as a mother and a father. We have a marriage, we don't know how long it's going to last, nobody does, regardless of the psychiatrist and psychologist. We have a move. We have plans to build a home. We have plans not to work. We have plans to do this and plans to do that. We have here in Cheyenne the status quo, we know what the situation is, we know where the children will live. We know who is here, the family, the parents, I feel that it is much less disruptive to these children to maintain this status quo as much as possible, and the Court finds it's in the best interest of these children to vest primary custody in their father. And the Court so orders."

On December 20, 1984, the court's decision was reduced to writing and formally entered. On December 21, 1984, appellant filed a motion for a new trial. She claimed that the court's decision to limit her right to call rebuttal witnesses infringed upon her right to be heard and her right to a fair trial.

A telephonic hearing on this motion was held on December 31, 1984. The court denied the motion saying, "I think that any rebuttal contemplated and even brought was just a further stirring on the same manure pile, to coin a phrase."

On appeal, appellant challenges the trial court's decision—in the middle of the trial—to permit only one rebuttal witness. This issue requires a balancing of a trial court's ability to regulate and control courtroom proceedings against the litigants' due process right to be heard.

It is well established in this country that all citizens enjoy the constitutional right to due process of law. Amendments V and XIV to the United States Constitution; Art. 1, § 6 of the Wyoming Constitution.

"[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons

forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971).

Any deprivation by the State of a fundamental right of one of its citizens must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

"The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, supra, 401 U.S. at 378, 91 S.Ct. at 786.

■ There can be no doubt that a fundamental right of appellant was at stake in the proceedings below. As this court has previously stated: "The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions." *DS v. Department of Public Assistance and Social Services*, Wyo., 607 P.2d 911, 918 (1980). Resolution of which parent shall have custody necessarily implicates the fundamental right of family association. Accordingly, a court must afford a parent notice and a meaningful opportunity to be heard before it can deny the parent custody of his or her children.

There can be no doubt that notice was provided in this case. The issue here concerns whether appellant was afforded a meaningful opportunity to be heard. In *Tanner v. Tanner*, Wyo., 482 P.2d 443 (1971), we reversed where the district court had modified custody provisions without a hearing. We stated: "[I]t is the general rule that in proceedings for modification of a divorce decree an opportunity to be heard is required." 482 P.2d at 445. In *Yates v. Yates*, Wyo., 702 P.2d 1252, 1255 (1985), we found no violation of *Tanner v. Tanner*, supra, where "appellant was not precluded in any way from producing what evidence she desired."

Here there was a hearing, but during that hearing the court, without warning, announced that appellee could not call any more witnesses and that appellant could only call one rebuttal witness. Both parties objected to this ruling and asserted that they had additional evidence to present. Appellee, having been successful, does not now complain; and we must deal, therefore, only with the effect of the court's ruling upon appellant. When the motion for new trial was denied, the court indicated that its ruling was, in essence, that any additional evidence would have been cumulative.

■ The right to be heard can be limited by "a state interest of overriding significance." *Boddie v. Connecticut*, supra, 401 U.S. at 377, 91 S.Ct. at 785. We believe that the State has an overriding interest in the orderly and efficient administration of justice. *McCabe v. R.A. Manning Construction Co.*, Wyo., 674 P.2d 699 (1983). Pursuant to this overriding interest, rules of procedure and evidence have been adopted. Courts may infringe upon the right to be heard to the extent permitted under these rules.

■ Rule 403, W.R.E., permits a court to exclude evidence "if its probative value is substantially outweighed * * * by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to exclude the evidence was made without inquiring as to whether there was anything new to present. Further, the court did not make allowance for the possibility that any of the evidence could be other than cumulative. It did not say that it would not permit a rehash of previous evidence; instead, it arbitrarily ruled that only one more witness could testify. Such a ruling had no basis and cannot be justified under Rule 403, supra. The court's decision was simply not to hear anymore of what the parties had to present. This ruling was in error under the rules of evidence. It infringed upon appellant's constitutional right to be heard.

██ In reaching that conclusion, we are not saying that a judge has no power to stop needless repetition of evidence. Rule 403, supra, can be employed to that end. The court can, pursuant to the rule, direct the parties away from material already covered. The court here did this several times in the present case. It can also explain to the parties that it is only interested in evidence concerning new matters. The court here also employed this technique. However, the court cannot simply cut off the evidence. To do so arbitrarily is an abuse of discretion. The court here abused its discretion; its ruling was not in conformity with the rules of evidence.

██ Rule 61, W.R.C.P., provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

This rule applies on appeal. Where an error occurring at the trial level is harmless, we will not reverse. However, the seriousness of the error and of the right infringed upon must be considered in evaluating the error as harmless. *Robertson v. State Highway Commission*, Wyo., 450 P.2d 1003 (1969).

In *Tanner v. Tanner*, supra, this court found error in the trial court's failure to hold a hearing on the request for modification. It did not, however, address the issue of the error's prejudice. Presumably this was because the court found the right to a hearing too substantial to permit a finding that the deprivation of that right was harmless.

██ Here, however, there was a hearing. On appeal appellant contends that she was prejudiced because she could not recall Mr. Rogers to respond to various accusations made against him by Dr. Giebler and appellee. Mr. Rogers had already testified in appellant's case in chief. He testified fully concerning his future employment, the proposed move to Minnesota, the new home the parties would occupy, and the projected circumstances of their new life. Appellant failed to show the court what Mr. Rogers could say in rebuttal that he had not said when placed upon the stand initially. There is nothing, either in the record or briefs, which indicates that Mr. Rogers had anything new to say. Accordingly, we must conclude that the error in the proceedings was harmless.

Affirmed.